Thomas J. MORIARTY,
Trustee, Plaintiff,

v.

B. Michael MUZYKA, Ltd., Defendant.

No. 03 C 7946.

United States District Court,
N.D. Illinois,
Eastern Division.

July 18, 2005.

Marisel Ayabarreno Hernandez, David George Huffman–Gottschling, Sherrie E. Voyles, Jacobs, Burns, Orlove, Stanton & Hernandez, Chicago, IL, for Plaintiff.

Michael Irving Leonard, Meckler, Bulger & Tilson, Chicago, IL, for Defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

SHADUR, Senior District Judge.

This Court's conduct of a bench trial in this action has been followed by the submission of proposed findings of fact and conclusions of law by counsel for the par-

ties: plaintiff Thomas Moriarty as Trustee and defendant B. Michael Muzyka, Ltd. This Court has given full consideration to each party's submission and to its own detailed trial notes (in aid of its independent recollection), and what follows are this Court's findings of fact ("Findings") and conclusions of law ("Conclusions"). To the extent (if any) that the Findings as stated may be deemed conclusions of law, they shall also be considered Conclusions. In the same way, to the extent (if any) that matters later expressed as Conclusions may be deemed findings of fact, they shall also be considered Findings. In both of those respects, see *Miller v. Fenton*, 474 U.S. 104, 113–14, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985).[1]

### Findings of Fact

*Background*

1. Each of Teamsters Local Union No. 727 Health and Welfare Fund ("Health and Welfare Fund"), Teamsters Local Union No. 727 Pension Fund ("Pension Fund") and Teamsters Local Union No. 727 Legal and Educational Assistance Fund ("Legal Fund") is an employee benefit plan governed and administered in accord with its Trust Agreement and amendments thereto (Stipulations of Uncontested Fact ["Stips."] ¶¶ 1–3). For convenience those three funds are referred to here by the collective term "Funds." Thomas J. Moriarty ("Moriarty") is a Trustee of each of Funds (Stip.¶ 4).

2. Moriarty filed this action on Funds' behalf to collect contributions claimed to be due to Funds per their audit report, as well as liquidated damages, interest, attorneys' fees and costs, including audit fees (Stip.¶ 24).

---

1. Because the trial occupied two widely-separated days (Aug. 26, 2004 and May 12, 2005), the transcripts of proceedings during those trial days are not consecutively numbered. "Tr. 1:—" and "Tr. 2:—" respectively refer to pages of the transcripts of the two trial days.

3. Funeral Director Services Association of Greater Chicago ("Association") is a voluntary membership organization that provides various services to its employer members (Stip. ¶ 5). In part it negotiates collective bargaining agreements with the Auto Livery Chauffeurs, Embalmers, Funeral Directors, Apprentices, Ambulance Drivers and Helpers, Taxicab Drivers, Miscellaneous Garage Employees, Washers, Greasers, Polishers and Wash Rack Attendants Union, Local 727 ("Union"), an affiliate of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (Stip. ¶ 8).

4. Association and Union were signatories to two series of collective bargaining agreements ("CBAs") that were in effect simultaneously throughout the period from December 1, 1992 through November 30, 2000 ("Audit Period"): one covering Auto Livery Chauffeurs and another covering Funeral Directors and Embalmers, Funeral Directors, Funeral Director and Embalmer Trainees, Trade Funeral Directors and Trade Embalmers (Stip. ¶ 9). Those CBAs prescribe wages, hours and other terms and conditions of employment of "covered employees" of Association's employer members, including Muzyka & Son's covered employees throughout the Audit Period (P. Exs. 5 and 6).

5. At all times since December 1, 1992 the Pension Fund and Health and Welfare Fund have been third-party beneficiaries of the CBAs (Stip. ¶ 10; P. Exs. 5 and 6). At all times since March 1, 1998 the Legal Fund has also been a third-party beneficiary of the CBAs (Stip. ¶ 10; P. Exs. 5 and 6).

*Operations of Muzyka & Son*

6. B. Michael Muzyka, Ltd. doing business as Muzyka & Son Funeral Home ("Muzyka & Son" or "Employer") is an Illinois corporation engaged in the business of operating a funeral home located at 5776 West Lawrence Avenue in Chicago (Stip. ¶ 12; Tr. 2:22–23). Basil Michael Muzyka ("Muzyka") is a funeral director and has been the sole shareholder in Muzyka & Son since 1992 (Stip. ¶ 13; Tr. 2:22–23). Muzyka & Son was a member of the Association at all times during the Audit Period (Stip. ¶ 14).

*Funds*

7. Under the terms of the CBAs that cover livery services, employers owe contributions to Funds on a per-trip basis for livery services that constitute covered work or services within the scope of the CBAs (P.Ex. 6a at Art. III; P. Exs. 6b and 6c at Art. V). Contributions due on behalf of each covered employee to each Fund are established by the CBAs and their addenda (P. Exs. 5 and 6). Throughout the Audit Period the Trustees have interpreted the CBAs as not requiring contributions to Funds for any individual who performs bargaining-unit work if that individual owns 10% or more of the business (Stip. ¶ 25; Tr. 1:28–29).

8. Since January 1993 William Coli has been the Administrative Manager for Funds. As Administrator he is in charge of the day-to-day operations of Funds, including (a) overseeing the receipt and subsequent posting of remittance reports and contributions from employers as required by the CBAs and (b) maintaining records regarding those contributions (Tr. 1:50).

9. As part of their regular practices and procedures, Funds send a "Contribution Report" form to signatory employers each month, and those employers are expected to return to Funds a copy of the Contribution Report indicating the contributions owed, together with those contractually required contributions (Tr. 1:24, 51–54). Those Contribution Reports require the employer to sign a monthly certification of its agreement to abide by the terms of Funds' Trust Agreements as well as the terms of the CBAs (Tr. 1:55–56; P.Ex.

2A). If any of an employer's employees quits, retires or is terminated, the employer is obligated to reflect such changes on the Contribution Report (Tr. 1:51–54). New hires are required to be shown in the same manner (*id.*). Funds' regular practice is to enter into their computer the employer revisions as shown such employer revisions on the returned Contribution Report, and those revisions are then reflected on the following month's Contribution Report (*id.* 54–55). Throughout the Audit Period, the Contribution Reports have been regularly maintained in Funds' offices under the supervision and control of Funds' Administrative Manager (Tr. 1:25).

10. Union has only six Business Agents to cover several hundred signatory employers (Tr. 1:25–26). One of the duties of those Business Agents is to visit signatory employers (*id.*). Due to the large number of employers and the small number of Business Agents, it is not feasible for Funds to rely on Union's Business Agents to provide effective regular policing or identification of all ERISA-violating employers (*id.*). Accordingly, Funds must perforce rely upon employer self-reporting and voluntary compliance for the payment of contributions owed pursuant to the CBAs (Tr. 1:25), and it is entirely reasonable to consider noncompliance by an employer as evidence of its delinquency in contributions.

11. In the funeral industry, "removals" are the transferring of human remains from the place of death to the funeral home (Tr. 2:24). Removals are performed from hospitals, residences, medical examiners' facilities and airports (Tr. 2:53). Removals are initiated by the family informing Muzyka & Son that a death has occurred, a notification that can occur at any time, including the middle of the night (Tr. 2:55).

12. Under the CBAs, two bargaining unit members are required to perform re-movals from most facilities (Tr. 2:56; P.Ex. 5a at Art. III § 9; P.Ex. 5b at Art. V § 10; P.Ex. 5c at Art. V § 10; P.Ex. 6a at Art. V § 1; P.Ex. 6b at Art. IV § 8). Although Illinois law requires a licensed funeral director to perform a removal but does not require more than one person to do so (Tr. 2:56), the CBAs' greater requirements control this action.

13. Muzyka and his funeral directors performed removals using one of the two vehicles owned by Muzyka & Son—either its Chevy Suburban or its funeral hearse (Tr. 2:37). Muzyka testified that from 1992 through September 1994 removals were typically performed by him and his funeral director employee Craig Moffat (Tr. 2:36–37), while from September 1994 through 2000 removals were typically performed by Muzyka and his funeral director employee David Kulawiak ("Kulawiak")(Tr. 2:38). Muzyka & Son did not document which particular individuals made individual removals that were performed in-house by Muzyka and his staff (Tr. 2:42).

14. On occasion Muzyka & Son was unable to perform a necessary removal in-house, and on those occasions it subcontracted the work to various outside services (Tr. 2:39). Those outside services typically tendered invoices to Muzyka & Son, and Muzyka & Son typically paid for those services by check (Tr. 2:39–42).

15. In the funeral industry, "livery" refers to a funeral hearse or a limousine (Tr. 2:24). Throughout the Audit Period Muzyka & Son used livery or livery services to transport caskets to the place of burial and to transport families on the day of a funeral service (Tr. 2:43). At all times during the Audit Period Muzyka & Son owned a funeral hearse that it used for those purposes (*id.*).

16. On occasion, if Muzyka & Son had more than one funeral in a day, it would

subcontract livery services to an outside provider (Tr. 2:43). Those outside services typically tendered invoices to Muzyka & Son, and Muzyka & Son typically paid for those services by check (Tr. 2:43–46).

17. Throughout the Audit Period one of Muzyka & Son's full-time funeral directors (depending on the time period, either Muzyka, Moffat or Kulawiak) directed each of the funerals performed by Muzyka & Son (Tr. 2:58). During a funeral service, that funeral director was the individual who directed and assisted the families and the public during the funeral service or ceremony (Tr. 2:57–58), including greeting people as they came into the funeral home (Tr. 2:57). While the funeral director was so directing and helping the family, he was not also parking cars outside (Tr. 2:58).

18. Muzyka testified that "we would use our funeral hearse" in performing livery services in-house during the Audit Period (Tr. 2:43) and that "on occasions I drove our funeral hearse for those—for those funerals" (Tr. 2:46). In that respect Muzyka & Son kept no records during the Audit Period showing which of its employees drove the hearse on particular funerals (Tr. 2:47). Muzyka later changed his "on occasions" characterization to an assertion that he drove the hearse for 99% of Muzyka & Son's funerals (Tr. 2:58). When then asked whether that meant that Kulawiak was the funeral director for the same 99% of the company's funerals, Muzyka disavowed that by saying that he himself was also the hearse driver on the funerals that he himself directed (id.). At the same time, Muzyka testified that he and Kulawiak shared in the duties of parking cars (Tr. 2:59), including the lining up of the funeral procession, making sure that the cars have the necessary funeral flags and stickers and making certain that the pallbearers' cars are close behind the hearse (id.). Yet while all of that is occurring, there is also a funeral director carrying out the necessary activities inside the funeral home (id.).

19. After Muzyka had testified that he was unaware that Muzyka & Son did not possess any documents demonstrating that he had driven the hearse on all of the livery trips reported on the audit, he acknowledged having testified during his deposition that, beyond marking a funeral folder "okay for livery," he kept no records that would show who drove the hearse for a given funeral (Tr. 2:59–62). Although Muzyka & Son maintained "funeral folders" throughout the Audit Period that detailed the particular services provided on a given funeral, those folders did not contain any indication as to which Muzyka & Son employee performed those services (Tr. 2:62).

20. Driving funeral livery vehicles falls exclusively within the work performed by auto livery chauffeurs as described in the CBAs covering chauffeurs (P.Ex. 6). Funeral Directors are in a separate bargaining unit and may not perform the work of auto livery chauffeurs, except that individuals who own more than 10% of the employing entity may drive without owing contributions to the Fund for those trips (P. Exs. 5 and 6; Stip. ¶ 25).

*Muzyka & Son's Employees*

21. Throughout the Audit Period, Muzyka & Son employed a full-time clerical staff person named Lorraine Sullivan (Tr. 2:55–56).

22. During wakes as well as during the funeral services themselves, a funeral director is also present to greet visitors and attend to the funeral home (Tr. 2:65). Such services, whether performed by funeral directors or funeral director trainees, are also covered services under the CBA in P.Ex. 6.

23. Sandra Turner ("Turner") performed services for Muzyka & Son during

the period June through October 1993 (Tr. 2:48, 64), though Turner was principally employed in the same time period by Muzyka's sister Margaret Muzyka, who owned her own separate funeral home (Tr. 2:26, 47). Muzyka testified that Muzyka & Son paid Turner on an hourly basis and that her duties included clerical work and greeting visitors and answering phones during wakes held at the funeral home (Tr. 2:48–49).

24. Muzyka testified that Turner worked for him on an as-needed basis in emergencies, when his secretary was ill or he was "overly busy" (Tr. 2:49, 64). Muzyka knew her to be a licensed funeral director trainee while she was employed by Muzyka & Son (Tr. 2:64). Muzyka & Son paid Turner $2,098.20 in 1993 (P.Ex. 19). In June 1993 the contractual wage rate for licensed trainees was $409.75 per week, and from July through October 1993 that rate was $425.50 per week (P.Ex. 5a at Art. II § 3(3)).

25. Lisa Hankamp ("Hankamp") performed services for Muzyka & Son during the period August through October 1995 (Tr. 2:50). Like Turner in the earlier time period, Hankamp was principally employed by Muzyka's sister Margaret (id.). As with Turner, Muzyka testified that Muzyka & Son paid Hankamp on an hourly basis (Tr. 2:51) and that her duties included clerical work and greeting visitors and answering phones during wakes held at the funeral home (id.).

26. Much as with Turner, Muzyka testified that Hankamp worked for him on an as-needed basis when he was "overly busy or had an emergency" over a period of "maybe a couple of weeks" (Tr. 2:50–51, 64). He also knew her to be a licensed funeral director trainee (Tr. 2:64). Muzyka & Son paid Hankamp $5,696.68 in 1995 (P.Ex. 19), when the contractual wage rate for licensed trainees was $474.50 per week (P.Ex. 5a at Art. II § 3(3)).

27. Kulawiak has worked for Muzyka & Son as a Funeral Director from September 1994 to the present (P.Ex. 3C; Tr. 2:38).

*Contributions for Kulawiak's Services*

28. From July 1992 to the present John Coli has been Secretary–Treasurer of Teamsters Union Local No. 727 (Tr. 1:14). As such he is head of that local union and is responsible for overseeing all aspects of its operations (Tr. 1:15). Before that (from 1981 until July 1992) he had been Union's Vice–President (Tr. 1:14). John Coli has participated in every collective bargaining negotiation between Union and Association since 1981, and he has been Union's chief negotiator since 1992 (Tr. 1:16).

29. John Coli is also a Trustee of Funds, a position he has also held since 1992 (Tr. 1:14). Before becoming a Trustee, John Coli had been Funds' Administrative Manager (id.).

30. Thomas Pekras ("Pekras") is Association's Executive Director, a position he has held since January 1, 1994 (Tr. 2:12).

31. On about February 29, 1996 Kulawiak signed a Health and Welfare Fund enrollment card stating that he had been employed by Muzyka & Son since 1994 (P.Ex. 3C). Muzyka & Son had not contributed to Funds for Kulawiak's services before March 1996 (Tr. 2:28). After receiving Kulawiak's enrollment card, in March 1996 Funds sent a letter to Muzyka notifying him that Muzyka & Son owed about $6,768 in delinquent contributions to the Health and Welfare Fund and about $3,570 in delinquent contributions to the Pension Fund for Kulawiak for the period September 1994 through February 1996 (Tr. 2:26–27; P.Ex. 4a).

32. Muzyka then communicated with Pekras sometime after March 1996 to ask that he arrange a meeting with John Coli

in order to resolve Funds' claim that Muzyka owed delinquent contributions to Funds for Kulawiak (Tr. 2:14, 27). Pekras attended a face-to-face meeting between John Coli and Muzyka at Coli's office located at 5940 West Montrose Avenue in Chicago, which Muzyka recalled having taken place around July 1996 (*id.*).

33. At that July 1996 meeting Muzyka proposed to pay the delinquencies claimed by the Pension Fund, but *not* to pay the delinquencies claimed by the Health and Welfare Fund. Muzyka proposed that Muzyka & Son begin paying contributions to both Funds for Kulawiak prospectively (Tr. 2:30). Muzyka & Son did begin paying contributions to both Funds for Kulawiak beginning in September 1996 (P.Ex. 12).

34. While Muzyka claims that John Coli agreed to Muzyka's proposal that Muzyka & Son pay only the delinquent Pension Fund contributions but *not* the delinquent Health and Welfare Fund contributions, Muzyka admitted that no such agreement was ever memorialized in writing (Tr. 2:31). For his part, Pekras did not recall any agreement being reached that day and did not recall John Coli agreeing to waive any contributions owed by Muzyka & Son (Tr. 2:14–15). Pekras further testified that on numerous occasions he attended meetings between John Coli and various members of the Association in attempts to resolve delinquent contribution claims by Funds (Tr. 1:22; Tr. 2:15). Those meetings always took place in John Coli's office, and Pekras could not recall a single occasion on which John Coli ever agreed at any of those meetings to waive contributions claimed by Funds (Tr. 2:15–16).

35. John Coli testified that as one of four Fund Trustees he could never do more than offer to refer any such employer requests to the full Board of Trustees for decision. Accordingly he said he would never agree to waive, and never did waive, contributions at any of the meetings with Pekras and employer representatives (Tr. 2:22–23). John Coli further testified that in his meeting with Pekras and Muzyka he told them that he did not have authority to act on behalf of the Trustees (Tr. 1:23–24), after which Muzyka and Pekras asked him to take back to the Trustees the request to waive delinquent Health & Welfare fund contributions for Kulawiak, for whom Muzyka said that Muzyka & Son had been paying private health insurance (*id.*). That request was not granted by the Trustees (*id.*).

36. This Court credits John Coli's testimony—not only because of the improbability of his granting a waiver that he was very much aware he had no authority to grant, but also because Pekras' testimony about John Coli's consistent conduct (and Pekras was not an interested party) provides a strong supporting inference.[2] This Court discredits, and hence rejects, Muzyka's version of the July 1996 meeting.

37. Following the parties' meeting Funds sent Muzyka a second letter dated July 15, 1996 showing increased totals through June 1996 that Muzyka & Son owed to the Pension Fund and the Health and Welfare Fund for Kulawiak (Tr. 2:32; P.Ex. 4b). Muzyka never responded to anyone at Funds about that letter (Tr. 2:33). Muzyka & Son later paid the increased delinquent contributions to the Pension Fund claimed in the July 15, 1996

2. No adverse inference is to be drawn from Pekras' testimony that he "did not recall any agreement being reached that day." On the contrary, his further testimony that he recalled no instance in which John Coli *ever* agreed to waive any claimed contributions in any of the numerous meetings that Pekras attended is surely corroborative of John Coli's express testimony.

letter, but it never paid the delinquent contributions to the Health and Welfare Fund (Tr. 2:33–34; P.Ex. 8).

*Funds' Audit Report*

38. At Funds' instruction the accounting firm of Legacy Professionals LLP ("Auditors") conducted, and completed in October 2002, an audit of the books and records of Muzyka & Son for the Audit Period. Auditors have standard procedures for auditing funeral-industry employers ("Audit Procedures"), and they conducted the audit of Muzyka & Son in accordance with the Audit Procedures (Stip.¶ 16).

39. Pursuant to the Audit Procedures, Auditors summarized the results of their audit of Muzyka & Son in a final audit report ("Audit Report") based upon Auditors' examination of Muzyka & Son' payroll documents, tax documents, cash disbursement documents and funeral contracts (*id.;* P.Ex. 12). Auditors also prepared a summary of their findings and procedures entitled "Notes and Procedures" (Stip. ¶ 18; P.Ex. 18).

40. Auditors found that Muzyka & Son owed $65,886.03 to the Health and Welfare Fund, $26,165.35 to the Pension Fund and $605.43 to the Legal Fund (those amounts exclude attorneys' fees and costs), itemized as follows:

| | Health and Welfare Fund | Pension Fund | Legal Fund |
|---|---|---|---|
| Contributions | $27,878.75 | $11,624.25 | $150.00 |
| Liquidated Damages | 5,575.75 | 2,324.85 | 30.00 |
| Interest | 24,252.35 | 8,374.52 | 53.65 |
| Payroll Audit Fee | 8,179.18 | 3,841.73 | 371.78 |
| Totals | $65,886.03 | $26,165.35 | $605.43 |

Those figures included contributions for Russo Funeral Service, which have now been disclaimed by Funds based on information provided by Muzyka after the preparation of the Audit Report (Stip. ¶ 21; P.Ex. 12). Pursuant to Funds' Trust Agreements, Auditors calculated the interest amounts at the rate of one percent above the prime rate, compounded monthly (Stip.¶ 22).

41. All the interest calculations reflected in Finding 40 included accrued interest through January 2003, but interest has continued to accrue on the delinquent contributions. Interest from January 2003 through July 2005, also calculated at one percent above the prime rate and compounded monthly, totals these amounts:

| | Health and Welfare Fund | Pension Fund | Legal Fund |
|---|---|---|---|
| Total findings in Audit Report | $65,886.03 | $26,165.35 | $605.43 |
| Interest January 2003—July 2005 | 7,814.10 | 2,997.68 | 30.53 |
| Updated Total | $73,700.13 | $29,163.03 | $635.96 |

42. Also pursuant to Funds' Trust Agreements, the liquidated damages included in Auditors' final Audit Report have been computed at 20% of the delinquent contributions (Stip.¶ 23). Finally, the Payroll Audit Fee included in the Auditors' final Audit Report is based upon the total amount billed by Auditors to Funds for their work on the audit. Auditors billed their employees' time spent working on the audit at an hourly rate or rates. That amount does not include any fees incurred after the issuance of the Audit Report, such as fees incurred in preparation for and attendance at trial (Tr. 1:71–74; P.Ex. 17).

43. This action was filed on November 7, 2003. Pursuant to a tolling agreement between the parties, Muzyka & Son has waived as a defense the statute of limitations for the period beginning April 23, 2003 (Stip.¶ 26). For their part, Funds have waived any claims for contributions predating April 1993 as barred by the ten-year statute of limitations applicable to Illinois-based actions for the collection of delinquent contributions pursuant to Section 515 of ERISA (*Central States, South-*

*east & Southwest Areas Pension Fund v. Jordan,* 873 F.2d 149, 154 (7th Cir.1989)).

44. As stated in Finding 40, since the issuance of the Audit Report Funds have waived contributions corresponding to services rendered to Muzyka & Son by Russo Funeral Service, totaling 487 trips (Tr. 2:5; Stip. ¶ 9). Eliminating the entries for Russo Funeral Service and the entries predating April 1993 (those waived by Funds) reduces the total delinquencies to the following (P.Ex. 12):

|  | Health and Welfare Fund | Pension Fund | Legal Fund |
|---|---|---|---|
| Contributions | $24,807.40 | $ 9,054.55 | $107.10 |
| Liquidated Damages | 4,961.48 | 1,810.91 | 21.42 |
| Interest (through July 2005) | 28,347.12 | 8,826.80 | 57.89 |
| Payroll Audit Fee | 8,179.18 | 3,841.73 | 371.78 |
| Totals | $66,295.18 | $23,533.99 | $558.19 |

This Court approves those figures as an accurate reflection of the Muzyka & Son delinquencies per its books and records, although it ultimately orders the lesser judgment amount set out in Finding 59 for the reason stated there.

45. Throughout the Audit Period the CBAs required that all removals be performed by two bargaining unit employees, one of whom was required by state law to be a funeral director (in that respect the CBAs allowed removals by a single funeral director from the Cook County Medical Examiner's Facility)(P. Ex. 5a at Art. III § 9; P. Exs. 5b and 5c at Art. III § 10).

46. Pursuant to the Audit Procedures, Auditors generated the entries on the Audit Report labeled "Employer failed to report removal trips (1–man removals)" by totaling the number of removal trips indicated on the Employer's funeral records and subtracting from that total the number of removal trips that the Employer's records indicate were performed by subcontractors. Where the Employer's records gave no indication as to who performed the remaining trips, the Auditors listed those unaccounted-for trips on the final Audit Report. Removal trips that the Employer's records indicated were performed by subcontractors that did not contribute during the relevant period to Funds were indicated separately on the Audit Report. Removal trips performed by subcontractors that were at the time delinquent in their contributions to Funds but that later paid those delinquencies were not, pursuant to the Audit Procedures, indicated on the Audit Report (Tr. 1:76, 79–85, 114–15; P. Exs. 12–14).

47. Auditors determined whether or not a subcontractor contributed to Funds during the Audit Period by reviewing information provided by Funds (Tr. 1:83–84). Funds also reviewed the Audit Report to verify whether all of the subcontractors identified on the Audit Report as non-contributing were contributing during the Audit Period, information that Funds maintain in a computer database in the regular course of business (Tr. 1:61).

48. Muzyka & Son did not forward contributions to Funds for the following numbers of removals, for which the CBAs specified the following contribution rates (P.Ex. 12):

a. December 1992 through February 1993—33 trips at $7.10 each;

b. March 1993 through February 1994—122 trips at $7.60 each;

c. March 1994 through February 1995—156 trips at $7.90 each;

d. March 1995 through February 1996—57 trips at $8.60 each;

e. September 1997—6 trips at $10.10 each.

49. Throughout the Audit Period the CBAs have forbidden the subcontracting of covered work performed by auto livery chauffeurs to employers who are not members of the Association or do not maintain the contractual standards provided for in the CBAs (P. Exs. 6b and 6c at Art. I § 7).

Muzyka & Son admits only that it owes contributions reflected in the Audit Report for subcontractors Glennon Funeral Service ("Glennon") and Dybinski Livery ("Dybinski") on that basis (Tr. 2:6–7; Stip. ¶ 19).

50. On occasion Glennon performed removal services for which it billed Muzyka & Son. In that respect Muzyka & Son did not forward a contribution to Funds for one removal trip performed by Glennon in 1997, for which the contribution rate specified in the CBAs was $9.30 (P.Ex. 12; Stip. ¶ 19).

51. Also pursuant to the Audit Procedures, the Auditors generated the entries on the Audit Report labeled "Employer failed to report livery trips" by totaling the number of nonremoval livery trips indicated on the Employer's funeral records and subtracting from that total the number of livery trips that the Employer's records indicate were performed by subcontractors. Where the Employer's records gave no indication as to who performed the remaining trips, the Auditors listed those unaccounted-for trips on the final Audit Report. Livery trips that the Employer's records indicated were performed by subcontractors that did not, during the relevant period, contribute to Funds were indicated separately on the Audit Report. Livery trips performed by subcontractors that were at the time delinquent in their contributions to Funds but that later paid those delinquencies were not, pursuant to the Audit Procedures, indicated on the Audit Report (Tr. 1:85–86; Stip. ¶ 20; P. Exs. 12–14).

52. Muzyka & Son did not forward contributions to Funds for the following livery trips, for which the CBAs specified the contribution rates indicated below (P.Ex. 12):

a. December 1992 through February 1993—50 trips at $14.10 each;

b. March 1993 through February 1994—148 trips at $15 each;

c. March 1994 through February 1995—169 trips at $15.70 each;

d. March 1995 through February 1996—162 trips at $17.10 each;

e. March 1996 through February 1997—176 trips at $18.50 each;

f. March 1997 through February 1998—114 trips at $20 each;

g. March 1998 through February 1999—128 trips at $15.50 each;

h. March 1999 through February 2000—137 trips at $16.30 each;

i. March 2000 through November 2000—86 trips at $17.30 each.

53. On occasion Dybinski performed livery services for which it billed Muzyka & Son. In that respect Muzyka & Son did not forward contributions to Funds for the trips performed by Dybinski indicated below, for which the CBAs specified the following contribution rates (P.Ex. 12; Stip. ¶ 19):

a. October 1995—2 trips at $17.10 each;

b. March 1996 through February 1997—7 trips at $18.50 each;

c. March 1997 through February 1998—5 trips at $20 each;

d. May 1999—1 trip at $16.30.

54. On occasion Glennon also performed livery services for which it billed Muzyka & Son. In that respect Muzyka & Son did not forward contributions to Funds for four trips performed by Glennon in the period from March 1997 through July 1997, during which time the CBAs specified a contribution rate of $20 (P.Ex. 12; Stip. ¶ 19).

55. Also pursuant to the Audit Procedures, the Auditors generated the entries on the Audit Report labeled "Employer owes Health & Welfare only for Trainee or

Fun. Dir." and the entries labeled "Employer owes for Health & Welfare and Pension for Fun. Dir." by identifying the employees indicated on the Employer's personnel and tax records who are licensed as funeral directors or as funeral director trainees by the Illinois Department of Professional Regulation, checking the employees' wages and checking Funds' records for evidence of contributions for those employees. Accordingly the Auditors listed on the Audit Report employees who are licensed and were paid commensurate with the contractual wage rate for funeral directors or funeral director trainees, but for whom Funds have no record of contributions (Tr. 1:87–92; P. Exs. 12, 16).

56. As to the portion of the Audit Report referred to in Finding 55:

(a) Muzyka & Son did not forward contributions to the Health and Welfare Fund for Turner for the months of June through October 1993, when the contribution rate for Funeral Director Trainees was $321 per month (Tr. 2:49; P.Ex. 12).

(b) Muzyka & Son did not forward contributions to the Health and Welfare Fund for Hankamp for the months of August through October 1995, when the contribution rate for Funeral Director Trainees was $391 per month (Tr. 2:50; P.Ex. 12).

(c) Muzyka & Son did not forward contributions to the Health and Welfare Fund for Kulawiak for any of the months of September 1994 through August 1996, and it did not forward contributions to the Pension Fund for Kulawiak for the months of July and August 1996. During those time periods the contribution rates to the respective Funds for Funeral Directors were as follows (P. Exs. 3c, 12; Tr. 2:38):

(i) Health and Welfare Fund for the months of September 1994 through February 1995: $346 per month;

(ii) Health and Welfare Fund for the months of March 1995 through February 1996: $391 per month;

(iii) Health and Welfare Fund for the months of March through August 1996: $415 per month; and

(iv) Pension Fund for the months of July and August 1996: $225 per month.

57. Muzyka testified that in addition to removals conducted by Russo at Muzyka's request when Muzyka & Son could not provide that service itself, on other occasions he contracted with some other firms for the same purpose—All Chicago, Affiliated Mortuary and Mrazek—and that those services were billed via invoices and were paid for by checks issued by Muzyka & Son and reflected on its books. Muzyka & Son has not shown that any of that testimony, or the activity that it reflected, impaired either the methodology or the conclusions of the Audit Report that this Court has approved in the earlier Findings.

58. Because Muzyka & Son has not maintained records sufficient to enable Funds' Auditors or this Court to determine which of its employees performed individual livery and removal trips throughout the Audit Period, the Auditors' calculations of the number of livery and removal trips performed by bargaining-unit employees for which contributions are owed is presumptively correct. That presumed correctness is not impaired, let alone overcome, by Muzyka's testimony. As a prime (but not the only) example, Muzyka's original testimony that he drove the funeral hearse "on occasions" is credible, while his later-reshaped contrary testimony that he, and he alone, drove the hearse for 99% of the funerals performed by Muzyka & Son—thus negating the entries that were picked up on the Audit Report—is not. Muzyka testified that he shares all other functions falling within the

duties of a funeral director equally between himself and his only other licensed full-time employee, Kulawiak. It is objectively implausible that Muzyka would hire a funeral director to assist him in every aspect of his work but would nonetheless still drive the hearse or the removal vehicle on all but a minuscule number of the funerals that he directed *and* that Kulawiak directed.

59. Under a strict application of the legal principles applicable to these Findings (including those relating to Muzyka's lack of credibility), Muzyka & Son would owe contributions for all trips for which it kept no records identifying a driver. That result, however, would appear to be at odds with the more likely course of conduct in which Muzyka and Kulawiak (or Moffat before Kulawiak) would have shared responsibility for the driving on removal and funeral livery trips, just as they shared all other aspects of the job duties encompassed within funeral directing. This Court will give Muzyka & Son the benefit of the doubt (see Conclusion 23) by attributing to Muzyka himself one-half of the removal and livery trips identified as unaccounted-for on the Audit Report (a generous concept addressed in Funds' proposed Conclusion 16). On that premise, the other one-half of the trips identified on the Audit Report remain unaccounted for, and hence call for contributions by Muzyka & Son. That, together with the exclusion of the amounts waived by Funds for Russo Funeral Service and the amounts predating April 1993 (P.Ex. 12), reduces the audit findings to the following:

| | Health and Welfare Fund | Pension Fund | Legal Fund |
|---|---|---|---|
| Contributions | $18,586.05 | $ 4,780.05 | $ 54.45 |
| Liquidated Damages | 3,717.21 | 956.01 | 10.09 |
| Interest (through July 2005) | 21,808.89 | 4,703.08 | 30.07 |
| Payroll Audit Fee | 8,179.18 | 3,841.73 | 371.78 |
| Totals | $52,291.33 | $14,280.87 | $467.19 |

60. As was the case with Muzyka's other testimony, his testimony that Muzyka & Son employed Hankamp for "a couple of weeks" and only "for emergencies" to do clerical work is not credible. Muzyka acknowledged on cross-examination that Hankamp worked for Muzyka & Son over a three-month period, with her earnings totaling $5,696.68. At that time (in 1995) the contractual wage rate for full-time funeral director trainees was $474.50 per week (P.Ex. 5a at Art. II § 3). Hankamp's pay came to $474.72 per week for 12 weeks, or the *full* contractual wage rate for full-time trainees. It is not credible that Muzyka & Son would have paid a licensed funeral director trainee the contractual full-time wage simply to do infrequent and routine clerical work requiring no funeral directing or embalming skills or licensure.

61. Muzyka's testimony that Muzyka & Son employed Turner only for occasional emergencies and only for clerical work also is not credible. Muzyka & Son paid her $2,098.20 over a five-month period in 1993. If that means she was paid the contractual wage rate of $425.50 per week for full-time funeral director trainees at the time, that would account for nearly five weeks—or a full 40-hour week per month. It is not credible that Muzyka & Son would pay Turner, a fully licensed trainee, the contractual wage rate simply to do clerical and other routine work that a non-licensed employee could perform. But if instead Muzyka & Son had paid Turner less than the contractual wage rate, it would follow that she worked even more than 40 hours per month, further discrediting Muzyka's testimony that she worked only on an emergency basis to fill in for his secretary.

62. Muzyka was, to put it most simply, not at all a credible witness, as demonstrated by the specific aspects of his testimony already discredited in these Find-

ings. Regrettably, both his testimony overall and the proposed Findings of Fact tendered on behalf of Muzyka & Son (and based on that testimony) reflect an attempted reshaping of the facts to support a claim that Muzyka & Son owes none of the unpaid contributions to Funds that are indeed owing, as reflected in the final Audit Report (with the modifications covered in these Findings)—a liability that is based on the objective facts and reasonable inferences therefrom. In sum, the only aspects of Muzyka's testimony that are credited are those supported by the express entries in Muzyka & Son's books and financial records that have been reviewed and found to be supportable by the Auditors.

### Conclusions of Law

1. This action is brought pursuant to Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, and Section 502(a)(3) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(3).[3] This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1337 and Sections 185(c) and 1132(e)(1). Venue is conferred pursuant to Sections 1185(a) and 1132(e)(2) because Funds are administered in this judicial district.

2. Each Fund is an employee benefit plan within the meaning of Section 1002(3).

3. Muzyka & Son is an Employer as that term is defined in the LMRA and ERISA, Sections 152(2) and 1002(3).

4. Moriarty is a Trustee of Funds and a fiduciary within the meaning of ERISA and is entitled to bring this action on behalf of Funds (Section 1132(a)(3); *Bugher v. Feightner*, 722 F.2d 1356, 1358 (7th Cir.1983)).

5. Union is a labor organization representing employees in an industry affecting commerce, as defined by the LMRA.

6. Section 1145 provides that "[e]very employer who is obligated to make contributions to a multiemployer plan...under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of...such agreement." As stated in *Laborers' Pension Fund v. A & C Envtl., Inc.*, 301 F.3d 768, 778 (7th Cir.2002):

> Section 515 [Section 1145] was intended to "permit trustees of plans to recover delinquent contributions efficaciously, and without regard to issues which might arise under labor-management relations law..." (quoting 126 Cong. Rec. 23039 (statement of Rep. Thompson)).

7. At all times during the Audit Period, Muzyka & Son was bound by the terms of the CBAs and was required to contribute to Funds for all bargaining-unit work performed by it or on its behalf, including all work performed by its covered employees. Those CBAs specify the amounts owed by Muzyka & Son to Funds for the various types of covered work performed by its employees and subcontractors, entitling Funds to contributions for all of the hours worked, unless Muzyka & Son were to show that some of the hours were not spent doing covered work (cf. *Ill. Conference of Teamsters & Employers Welfare Fund v. Mrowicki*, 44 F.3d 451, 458 (7th Cir.1994); *Central States Pension Fund v. Hartlage Truck Service, Inc.*, 991 F.2d 1357, 1360 (7th Cir.1993)).

8. Federal common law principles of contract interpretation govern and require this Court to interpret the CBAs,

---

**3.** Further citations to provisions of Title 29 will simply take the form "Section—," with the citations referring to the Title 29 numbering rather than to LMRA's and ERISA's internal numbering.

giving their language its ordinary meaning (*GCIU Employer Retirement Fund v. Chicago Tribune Co.*, 66 F.3d 862, 864–65 (7th Cir.1995); *Phillips v. Lincoln Nat'l Life Ins. Co.*, 978 F.2d 302, 307 (7th Cir.1992)). This Court must enforce the terms of the CBAs when their terms are unambiguous (*Central States v. Hartlage Truck*, 991 F.2d at 1361).

9. Section 1059(a)(1) required Muzyka & Son to maintain records with respect to each of its bargaining-unit employees and with respect to bargaining-unit work performed, in each instance sufficient to determine the benefits due or that may become due to or on behalf of such employees.

■ 10. *Laborers' Pension Fund v. A & C Envtl.*, 301 F.3d at 782–83 is exemplary of the cases that consistently teach:

[I]f a pension or welfare fund has proven that an employer is liable for delinquent contributions, and the employer has failed to keep records that would allow the fund to calculate the precise amount of contributions owed, then the burden shifts to the employer to come forward with evidence of the precise amount of covered work (work covered by the CBA) performed by its employees or to come forward with evidence to challenge the accuracy of the fund's calculations.

Accord, *Chicago Dist. Council of Carpenters Pension Fund v. Reinke Insulation Co.*, 347 F.3d 262, 264 (7th Cir.2003).

■ 11. At all times during the Audit Period, the CBAs required Muzyka & Son to contribute to Funds on behalf of part-time, extra and regular auto livery chauffeurs employed by Muzyka & Son for removal and funeral livery trips and all other bargaining unit work performed by such persons. Muzyka & Son has violated the CBAs, the Trust Agreements and ERISA by failing to contribute to Funds for the individual removal trips and livery trips indicated in the Audit Report. Muzyka & Son therefore owes Funds contributions for those trips at the rates provided in the CBAs, as summarized in the Audit Report as modified by Finding 59.

12. Muzyka & Son also violated the CBAs, the Trust Agreements and ERISA by failing to pay contributions to Funds for removal and livery services provided by Dybinski Livery and Glennon Funeral Service during the Audit Period. Accordingly, Muzyka & Son also owes Funds contributions for the removal and livery trips performed by Dybinski Livery and Glennon Funeral Service for which it did not make contributions. Those required contributions are properly included in the Audit Report.

13. At all times during the Audit Period, the CBAs also required Muzyka & Son to make contributions to Funds for full-time licensed funeral directors and embalmers and funeral director and embalmer trainees who perform funeral directing and embalming tasks that require a license from the State of Illinois and who did not have a 10% or greater ownership interest in the business.

■ 14. Funds are not estopped from claiming contributions for David Kulawiak on the basis of Muzyka's meeting with Pekras and John Coli. No reasonable person could have believed that Funds' Trustee John Coli, when he agreed (as he did) to refer to the entire Board of Trustees Muzyka's request that Funds waive Health and Welfare Fund contributions for Kulawiak, was himself waiving those contributions (*Teamsters & Employers Welfare Trust of Ill. v. Gorman Bros. Ready Mix*, 283 F.3d 877, 883–84 (7th Cir.2002)). Findings 34–36 have already determined that Muzyka's testimony that John Coli actually agreed at the meeting to waive the contributions is not credible.

■ 15. Nor could any reasonable person have believed that, absent a written agreement from the entire Board of Trustees following Muzyka's meeting with John Coli, the Trustees had waived health and welfare contributions for Kulawiak. To the contrary, immediately after the meeting Funds issued another written demand for payment for those claimed contributions, and thereafter those same still-unpaid contributions were picked up in Funds' audit of Muzyka & Son. Again no estoppel can be asserted to avoid the obligation of Muzyka & Son to make current payment of those contributions.

■■ 16. As Findings 35 and 36 indicate, the credibility of John Coli's testimony regarding the meeting (and of Pekras' consistent testimony), together with the corresponding lack of credibility of Muzyka's version of events, is further buttressed by the absence of authority on the part of John Coli alone to agree to waive contributions owed to the Health and Welfare Fund even if he had been so inclined. Where as here the assets of a fund are held jointly by two or more trustees, Section 1105(b)(1)(B) provides that the trustees "shall jointly manage and control the assets of the plan...." As *Mason & Dixon Lines, Inc. v. Glover*, 975 F.2d 1298, 1303 (7th Cir.1992), citing *Central States Southeast and Southwest Areas Pension Fund v. Central Transp., Inc.*, 472 U.S. 559, 570, 105 S.Ct. 2833, 86 L.Ed.2d 447 (1985) confirms:

> Congress has invoked the common law of trusts to define the general scope of the authority and responsibilities of plan trustees.

Under the common law of trusts the exercise of joint powers requires action of all trustees (*Mason & Dixon Lines*, 975 F.2d at 1303, citing (among other authorities) *Restatement (Second) of Trusts* § 194 (1959) and *Stuart v. Continental Ill. Nat'l Bank & Trust Co.*, 68 Ill.2d 502, 12 Ill. Dec. 248, 369 N.E.2d 1262, 1271 (1977)). And *NLRB v. Amax Coal Co.*, 453 U.S. 322, 336, 101 S.Ct. 2789, 69 L.Ed.2d 672 (1981), interpreting Section 302(c)(5) and ERISA, has held that trustees of multiemployer funds are powerless to modify an employer's written pension promises because "they can neither require employer contributions not required by the originally collectively bargained contract, nor compromise the claims of the union or the employer with regard to the latter's contributions."

■ 17. Finally as to Kulawiak, the fact that Muzyka & Son may have purchased private health insurance for him during the 1994–96 period when it failed to contribute for him to the Health and Welfare Fund is irrelevant either to the finding of a violation or to the calculation of the appropriate damages. Contributions to employee benefit funds are for the benefit of the entire class of covered employees, not just the individual employee whose services trigger the contribution requirement. Hence the CBAs did not simply require Muzyka & Son to secure health coverage for bargaining-unit employees. Instead the CBAs required Muzyka & Son to contribute to Funds, and Muzyka & Son failed to meet that obligation (*O'Hare v. Gen. Marine Transp. Corp.*, 740 F.2d 160, 170 (2d Cir.1984)).

18. At all times during the Audit Period the CBAs applied to "employees serving as funeral director and embalmer trainees" (P. Exs. 5a, 5b and 5c, Art. I § 1). They therefore required Muzyka & Son to contribute to Funds both for all funeral directors and embalmers and for all funeral director and embalmer trainees employed by Muzyka & Son. They did so without particularizing what job functions the employees in these positions may or must perform—they rather spoke in terms of the employee categories. Because Mu-

zyka & Son employed Hankamp and Turner, who (as Muzyka knew at the time) were licensed funeral director trainees, and because it paid them at or near the contractual rate for licensed trainees, it must be concluded that the scope of the work assigned to them caused them to be included within the bargaining unit. That conclusion is not altered by the fact that Muzyka may have asked them to perform "wake duty"—after all, he and Kulawiak also perform the same job duties he described as "wake duty." Nor does the fact that Muzyka may also have asked Hankamp and Turner to perform clerical duties remove them from the bargaining unit.

19. In summary of Conclusions 13 through 18, Muzyka & Son has violated the CBAs, the Trust Agreements and ERISA by failing to pay contributions to Funds for Turner, Hankamp and Kulawiak as indicated in the Audit Report. Accordingly, Muzyka & Son owes Funds contributions for the months indicated and in the amounts indicated in the Audit Report.

20. Finally as to Funds' substantive claims, the doctrine of laches does not bar their collection. Funds' claims have been timely brought in limitations terms, and the fundamental role of statutes of limitations is to prescribe the legislative branch's definition of what is or is not a stale claim. As *Central States v. Jordan*, 873 F.2d at 154 said in determining that a ten-year limitation period should apply to actions such as this:

> The overriding policy consideration in this case is the integrity of the Pension Fund and its ability to pay its beneficiaries. The Pension Fund must rely on self-reporting by employers. It may take time for the Pension Fund to discover irregularities in employer contributions. Characterizing this action as an action on a written contract contributes to the stability of pension funds and

will encourage employers to meet their obligations.

For that determination to be overridden by a judicial determination based on equitable considerations that bear the "laches" label, one essential ingredient of a defendant's showing must be the proof of impermissible prejudice due to the lapse of time. Here Muzyka & Son has clearly failed to show any claimed prejudice as a result of any asserted "delay" in collecting the delinquencies identified in the audit report.

21. In actions brought by employee benefit plans against employers for delinquent contributions, Section 1132(g)(2) provides that when a judgment in favor of the plan is awarded, the court shall award (a) the unpaid contributions, (b) interest, (c) the greater of interest or liquidated damages of 20%, (d) reasonable attorneys' fees and costs and (e) any other appropriate legal or equitable relief. That award is mandatory (*Laborers Health & Welfare Trust Fund v. Advanced Lightweight Concrete Co.*, 484 U.S. 539, 547, 108 S.Ct. 830, 98 L.Ed.2d 936 (1988); *Plumbers' Pension Fund v. Domas Mech. Contractors, Inc.*, 778 F.2d 1266, 1271 (7th Cir.1985)).

22. Lastly, the audit fees submitted by Funds' Auditors and claimed by Moriarty are necessary and reasonable in amount. Such reasonableness does not depend upon the size of the delinquency uncovered by the audit (*Chicago Dist. Council of Carpenters Pension Fund v. Sciortino Contractors, Inc.*, 934 F.Supp. 277, 279 (N.D.Ill.1996)), and the scope of the Auditors' services was necessitated by the extended period involved in the audit and the need to analyze the extensive records under the circumstances described in the Findings. Moriarty is further entitled to any reasonable fees incurred by the Auditors in connection with this matter since completion of the Audit Report, although Moriarty may opt not to pursue that additional relief (see Conclusion 24).

23. Because the deficiencies in Muzyka & Son's recordkeeping referred to in the Findings (see, e.g., Finding 58) have rendered it impossible to arrive at a precise figure for its delinquent contributions, it would have been permissible to mulct it in damages with the full amount reflected in the Audit Report after appropriate adjustments (see Finding 44). That would constitute an appropriate application of the principle announced six decades ago in *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264–66, 66 S.Ct. 574, 90 L.Ed. 652 (1946) and still true today—see, e.g., *BE&K Constr. Co. v. Will & Grundy Counties Bldg. Trades Council*, 156 F.3d 756, 770 (7th Cir.1998) (citations and internal quotation marks omitted), stating:

> While damages cannot be based on pure speculation or guesswork, they also need not be proven with the certainty of calculus. And where, as here, the uncertainty as to the damages stems from the defendants' illegal conduct, the defendants should not benefit from the uncertainty they created: Speculation has its place in estimating damages, and doubts should be resolved against the wrongdoer.

But as Finding 59 reflects, this Court has opted for a lesser damage award by applying a less onerous standard—albeit that too is necessarily imprecise because of Muzyka & Son's deficiencies.

24. In summary, pursuant to Section 1132(g)(2) and the terms of Funds' Trust Agreements, judgment is hereby ordered to be entered in favor of Moriarty and against Muzyka & Son in the amount of the contributions as determined above, liquidated damages equal to 20% of the unpaid contributions, interest on the unpaid contributions at the annual rate of 1% above the prime rate, compounded monthly and Funds' auditors' fees, all as quantified in Finding 59, together with Moriarty's attorneys' fees and expenses as well as taxable costs. Although the amount of the award of attorneys' fees and expenses is necessarily unknown at this time, that fact does not deprive the judgment of finality and hence enforceability (see *Budinich v. Becton Dickinson & Co.*, 486 U.S. 196, 108 S.Ct. 1717, 100 L.Ed.2d 178 (1988)). But the *Budinich* principle would not seem to apply to an as-yet-unascertained additional auditors' fee, so that Fed.R.Civ.P. 54(b) would appear to deprive the judgment of finality if such a claim is advanced. Accordingly this action is set for a status hearing at 9:15 a.m. July 21, 2005, so that Moriarty's counsel can then advise this Court as to their wishes in that respect.